Thank you, Your Honor. May it please the Court, I'm Scott Stewart on behalf of the United States. If I may, Judge Fletcher, I'd again like to save five minutes for rebuttal. In this case, the District Court enjoined nationwide the MPP, an important executive branch initiative to address unlawful immigration. The District Court's injunction is profoundly flawed. A motions panel of this Court already stated that injunction. This merits panel should now vacate the injunction. Do we have the same question again as to the consequence for possible binding effect of the motions panel decision? Right, Your Honor. The government's position is the same. Normal law of the case treatment, with its exception, applies. The decision was published, but our position is that law of the circuit treatment does not apply to that. There's some language in the opinion, however, that does not, in contrast to Judge Bybee's opinion in the last case, the language in the procurium talks about likelihood with respect to the questions of law. It doesn't say here is the answer with respect to the questions of law. It does contain, it contains different ranges of statements, Your Honor, but this is at ER 68. The procurium squarely concludes. Well, if you can not do me the ER, I've got the F-3rd in front of me. That's more helpful if you just give me the ER site. Sure. I'm sorry, the F-3rd site. I'm not sure that I have the F-3rd here, Your Honor. I apologize for that. I'll quote for you, and I can try to dig that up if that would be helpful. The Court did say flat out, again, this is at ER 68, the plaintiffs are properly subject to the contiguous territory provision because they were processed in accordance with Section 1225b2a, and I think that's a pretty square legal conclusion. Well, but I'm reading, and we're off on different pages. I'm on F-3rd at 509. We are doubtful that B-1 applies, and then later on the second column, for the foregoing reasons we conclude that DHS is likely to prevail on its contention that B-1 applies. That does not sound like a flat holding on a matter of law. I think that that's a lead-up to that conclusion I reached, Your Honor. Again, I think the — I would rest it. I think that the Court did squarely state in that language I quoted that — I mean, it is stating it in the words of the standard as far as a State pending appeal. I mean, the issue is legal. I think it is still, you know, correct, look, preliminary injunction stage, the government is likely to prevail on the merits, so — Well, but those statements were likely to prevail on a question of statutory construction. They were specifically speaking to the statute, not as likely to prevail on the merits of the entire case. And the way we handle this in preliminary injunctions is that if it's a question of law, the district judge may be reversed if we simply disagree on the question of law, and we so state. Here, as I read that McCracken opinion, it says likely to prevail on the legal question rather than saying here is the answer to the legal question. Again, I think — I mean, I think it's still a conclusion that the government has the better of the legal argument, Your Honor. That's essentially — well, what the panel said at the end, just in the Section 2 of its discussion, right, before it moves on to the other two factors regarding stay. It says DHS has therefore made a strong showing on both the first and second factors, which are the most critical, citing Enkin, which is the point that I was getting at in the last discussion, which is isn't what the panel's — Emotions panel is doing different, what they're considering — I mean, I think — — under Enkin than what we're — than what's before us. Did the district court abuse its discretion in granting a preliminary injunction? There are some differences, Your Honor. Again, I think here it is a question of law. It is a question of statutory interpretation. And as we already said in the early argument, it is a high bar to show that a purely decided legal question, that there's a clear error on that. And I think the panel's statements should be taken as a square — you know, pretty square conclusion that this is — Square or pretty square or maybe or likely or strong showing or — I take the point, Your Honor. Those are different words. Right. I mean, Your Honor, I mean, I guess part of how I'd sort of parry that would be even in Judge Bybee's decision in the East Bay 1 case, it should be read in the context in which it was written, which is a State panel decision and the limitations — and the limitations that come with that. I mean, both of these decisions, you know, they didn't have — they didn't have, you know — Judge Bybee's, if anything, had more in the way of reservations for what the district court could still do. The record had already been produced in the district court in this case. This court had argument in this MPP case. So there was a good amount of consideration, took some time to reach that conclusion. Again — A good amount of — you know the schedule as well as I do. We heard argument one week after the — I believe one week after the motion was filed. Agreed. And I think, given this court — That's not a lot of time. It is truncated, Your Honor. What I'm saying is that, given the court's various precedents, we think the best — the proper approach in light of those precedents is simply law of the case treatment. We are — as Your Honor knows, we're not advocating for law of the circuit treatment. We do agree that that is inappropriate in the context of a motion panel decision. On this statutory authority question, Your Honor, the critical point I want to — our pitch is that Section 1225b2a and 1225b2c are what authorize MPP. A key thing here is that it's conceded that — the plaintiffs conceded this in their complaint, the district court agreed this, it's undisputed that the government has discretion to put somebody into expedited removal proceedings, the proceedings that are described and set forth in 1225b1, or in a full removal proceeding under Section 1229a, Section 240. Sure. That's all — that comes right out of b1, sure. Right. And it goes to — but it also hooks in b2a, Your Honor, and this is the important thing. The only statutory hook for the government's ability to put somebody directly into a full Section 1229a, full normal ordinary removal proceeding, is that Section 1225b2a authority. There's not another statutory hook for that. So if it's all conceded and it's undisputed that DHS can place somebody directly into a full removal proceeding, b2a is the authority for that. And once that's — once that's in place, the b2c, the continuous return authority, comes with that. And our submission is — I'm not sure I read the statute the same way. The government has never previously made this argument, and as far as I'm aware, there's no published decision either by the BIA or by a court of appeal that in order to put someone — put a b1 applicant into 1229a or 240 proceedings, that they need to be filtered through b2. I'm unaware of any statement prior to the government's argument on this point. Your Honor — Is there such? I'm not sure that there is a square statement of that, Your Honor, but the — Is there even an indirect statement of that? Your Honor, I would quibble with your characterization of — over what the clear and longstanding history here is. The government has not deployed this contiguous return authority on a kind of larger systemic basis, as it is doing here. I'm asking you a different question. Is there anything either written by the BIA, written by a court of appeals, prior to what the government is now saying that says that in order for a b1 applicant to be given a hearing, they have to be filtered through b2? I mean, I think that's — the closest I can give you, Your Honor, is matter of ERM, where the — it's hard because I do quibble with the premise of the question because I don't believe that there is such a thing as an immutable b1 applicant and an immutable b2 applicant. Well, there we disagree. I mean, b1 is — there are two specifications for b1 very clearly spelled out. They either are without documents or they are for identity documents. And b2 is everybody else. That's not what b2 says, Your Honor. What b2 says — b2 says other. Right? That sounds like everybody else. Your Honor, but that doesn't give effect to the language of b2a, which says an alien-seeking admission, when an officer determines that an alien-seeking admission is not clearly and beyond a doubt entitled to be admitted. That sweeps in. It's a literal catchall, as the State panel said, all of the people described in b1. And it's — so they can — they could be put into either set of proceedings. They're amenable to either one. And what do you do with the Supreme Court's splitting out the two? Do you just think they weren't focusing very carefully? Your Honor, you're putting an awful lot of reliance on a background descriptive paragraph in the Supreme Court's Jennings decision that — So you're saying they weren't thinking very carefully. I — Your Honor, what I'm saying is the Supreme Court has not reached a square holding on this, but the Jennings decision does support the government on this because it shows the importance of that initial determination by an officer as to which proceeding to put an alien in when the alien could potentially be placed in either one. That's why Jennings emphasizes the initially determined folks. And then if somebody is initially determined to be placed into b1, then, you know, then somebody who's — for whom that determination is not made is placed into b2. Those are the other aliens that that provision describes. I think the State panel had that right. It's very — it's a good harmonization with Jennings. I would say that Jennings really did not resolve this issue, I respectfully submit, Your Honor. I would add, Your Honor, that, again, this comes down to an issue where it's undisputed that the government can place an alien who could be placed in a b1 expedited removal context, that such folks can also, at the government's discretion, be placed in b — into a full removal proceeding. The mechanism for that, again, it has to be b2a as a statutory hook. And given that concession, given that b2a is the statutory hook — Now, what was the concession again? That the government has discretion to place an alien either in expedited removal proceedings or straight into full removal proceedings, Your Honor. Right. Provided they've gone through the proceeding of credible fear and so on. But the concession does not include a concession that someone coming in under b1 and who's given — been subjected to that discretionary decision is also a b2. That's your argument, but I don't think there's a concession on that one. There isn't. That's not correct, Your Honor. They concede that somebody does not have to go through the credible fear process to be placed directly into a full removal proceeding. What they're refusing to acknowledge is that the only basis to be, as a statutory matter, to be placed into that full removal proceeding is b2a. Paragraph 73 of their complaint concedes this discretion to place an alien who could be amenable to either one, to place them directly into a full removal proceeding. Does the exception under b to b2, little 2, says one was an accruement and then to whom paragraph 1 applies, how does that — how does that impact your argument, if at all? Sure, Your Honor. That, as we've explained and as the panel recognized, it states a clarifying function. As a general matter, an alien who fits into the b2a category, that is, those determined not to be clearly and beyond a doubt entitled to be admitted, on that language such a person would be entitled to a full removal proceeding. What Romanet 2, what Your Honor is highlighting, is that if somebody could be placed in a b1 set of proceedings, then that entitlement — they're not entitled to a full removal proceeding. They could be placed there, but it's not a guarantee to them. That's what that does, Your Honor. It serves a useful clarifying function. But doesn't that just demonstrate that there are two separate categories? No, Your Honor. I mean, it's — it would be very odd to — respectfully, it would be very odd to view these as two immutably different categories of aliens because it would have the consequence that the only people — the only people who could be returned to a contiguous territory are those who have a facial entitlement to be admitted to the country or who have, you know, legitimate documents or the like. Returned pending adjudication of the asylum application. Right, Your Honor. Not returned altogether, but returned pending. Returned to contiguous territory pending the further proceeding, Your Honor. And we're just saying, you know, it would be very strange because it would be kind of — you know, it'd be — it'd be weird to give that — give that sort of a consequence to a population that, on the face of what they present, don't have an entitlement to be in the country and are, in fact, subject to very quick proceedings to — if they don't — if they don't make the adequate showing, to be returned to their home country. So there's very little entitlement to that group. And the logical — and the thing that Congress was really getting at here is that folks who fit into this B2A category, if — they're subject to mandatory detention. And Congress, in enacting the B2C authority, recognized, hey, as an alternative to mandatory detention, DHS should be able to return these folks who are going to be in proceedings for some time. They're going to have pending proceedings. So are they subject to mandatory detention in the sense that they must or that they can be detained? I think they must be detained. It's mandatory. I — as a practical matter, Judge Fletcher, I don't — you know, my — DHS cannot, unfortunately — I mean, this is part of the problem that we're trying to address here, is that detention space is limited. So despite the rule of mandatory detention, it's just not something that's able to be deployed in practice. As I read B1, B2, the reason for the subsection C in B2 is that there's a large group of variously defined — I won't say numerically large group, but lots of different characteristics for the other. That is to say, B1 is coming in with no documents or false documents. B2 is other. Other include a really — a whole bunch of undesirable characters. And as I read subsection C for B2, that allows the government, when it's determined that this is an undesirable character, including the person in the case that stimulated the addition of the statute — of that section of the statute, who was a drug dealer, to say, as to you, you've got to wait outside the country. How do you respond? Because that seems to me a fairly sensible judgment by Congress, and it seems to me right there in the statute. Here's how I'd respond, Your Honor, is that it does sweep in characters who I think we all agree are not good folks and who present dangers. But it also sweeps more broadly than that. It is that broader category described in B2A, the folks who are just — That's, in my view, why Congress gave to the government the discretion. Some of you, the bad characters, we're going to apply a subsection C to you. You're going to wait outside the country. The others, you can be in the country while we decide. And my response there, Your Honor, would be to just emphasize the text of the statute, that it just doesn't have that kind of bad characters only language. It's really focused on the lacking any entitlement to be admitted and what follows from that. You know, your time is going to run, and I think we need to talk about reform. Yes, Your Honor. Because I think you're in real trouble on the — at least insofar as Judge Watford has told you, you know, you don't even ask whether they have any kind of fear. And that was — that's reasonable in this context, Your Honor, and here's why. It's that the contiguous return context, it's different in kind from the withholding of removal context. And even my friend in the district court acknowledged you don't need the same procedures as in the withholding context. They don't need the same procedures, but you're giving them nothing. That is to say, you're not even asking them the key question with respect to reform. That is to say, are you afraid? And, Your Honor, the — the response there is that somebody can raise this concern at any time. Purportedly, these are — these plaintiffs are asylum seekers who are — who are, at least according to their claims, fleeing persecution and have fears, including in Mexico. It would be logical for them, and the reason — the agency can reasonably conclude that they would volunteer their harm. Do you have anything other than speculation to support that? I mean, it's the logic of the provision itself, Your Honor. I mean, this — I understand it's the logic of the provision, but I'm asking about the real world. Do you have any — do you have any evidence of any sort that tells you that you're going to get a high percentage of people volunteering that information? It's — it's not a perfect analogy, Your Honor, but I — there is a very high number of people who claim a credible fear of persecution. And in a great many cases, they ultimately are not — you know, that means — No, but they're — but they're asked. But — but, Your Honor, you asked — you asked the possibility of somebody making a claim for something and having it borne out, and that's just a — No, no, that's not my question. My question is, if someone coming to the border is said, well, we're about to send you back, and they're not asked, are you afraid of going back, you're saying, well, of course they would say that. I'm not at all sure they would say that. It's — it's a — Your Honor, this is a different-in-kind context, where somebody's not — they're — they're being returned temporarily to liberty in a country where they spent a significant amount of time that is not the country that they're claiming — that they're going to be removed to, that they're claiming to flee. Different procedures can apply, and the agency could reasonably conclude that, look, this is a — this is a different context. Reasonably conclude based on what? Does the government — does the government have any evidence, or is this all speculation as to what the government's, quote, reasonable person, close quote, would do? Again, Your Honor, I mean, I think that there's no dispute that some number of people do, you know, claim a fear and are interviewed. I think the question is one of how best to do this, given, you know, the concern about false positives and just the fact that many people will make claims because the DHS could reasonably conclude that they want to, you know, stay or they want to, you know, be released, those kinds of things. So I think it's a logical conclusion that — Again, Your Honor, I mean, this is a facial — So the answer is yes, you don't have much on the record. I think I've — you know, we've hit some of these things in your brief — in the briefs, Your Honor, but we have emphasized this is a different — this is a different context, and the agency, as the Trinidad and Garcia case emphasizes, can adopt a procedure that is calculated in this more likely or not way to address — to address the standards at issue. If I may, Your Honor, I'll — I see I'm down, but I'd like to say — Well, you're down to the very end, but we'll make sure you get a chance to respond. I appreciate it, Judge Fletcher. Good morning, Your Honors. My name is Judy Urbinovitz. I'm counsel for the — excuse me — for the Plaintiffs' ACLU. I'd like to start on the statutory issue, because I agree, Judge Fletcher, that we agree that the statute — that this policy is not authorized by statute, and we also agree, for the reasons you said, that you're not foreclosed. But I'm very glad that you went on to the non-rafflemoan claim, because we're — we think it's very important that the court issue an alternate ruling on that ground as well, because our — our chief concern right now, and it's urgent, is that — to prevent the suffering that is happening as a result of this policy. And the greatest suffering is happening — I mean, there's suffering across the board, but the greatest suffering is with respect to those individuals who are being returned to persecution or torture, despite the non-rafflemoan obligation. And our concern is just to ensure that we get relief for those people. So while we believe that this — that there's good reasons, it would be best to enjoin the policy as a whole, we also think that an injunction that went to the procedures would provide meaningful relief, not the kind of relief that we would ultimately want, which is to enjoin the policy, but we do think that it would provide meaningful relief. And in terms of our concern to make sure, to do the most we can to make sure that our — that our plaintiffs and others like them get relief, we just want to make sure that the court addresses that issue as well. So with the court's permission, I'm going to focus on the non-rafflemoan claim, which I think, as you've already made a strong case, and as both Judge Seaborg and Judge Watford made a strong case, the government doesn't really have much of a case on the merits to defend its procedure, nor does it have much of a case on the equities, because the equities are strongest here, where the government itself said that its policy needs to comply with the non-rafflemoan obligation. And yet the policy that it implemented is so far from doing that, that there's no way that that policy can be — remain in place. There are a lot of statements in the amicus briefs on what's actually happening. Is any of that in the record before us? No, Your Honor, that's not in the record. But there is substantial other evidence in the record that goes to the harm. And I'd point to the plaintiff's declarations, where they talk about the harm that they have suffered, kidnapping, attempted rape. I'll talk to the administrative record itself, where the government's — where there are documents in the administrative record that point to the kinds of dangers that migrants face in Mexico. So, you know, especially when you go back to the question of the APA question, of whether this policy can even — can minimally survive under the APA, you look at whether the government provided a reasoned explanation for its policy. And given what was in the record, known — the known dangers that migrants face in Mexico, to adopt a procedure that is supposed to protect people against persecution and torture that has none of the safeguards that the government has used when it is implementing this procedure elsewhere justifies logic. And I think that Judge Watford said it very clearly when he said, how am I supposed to believe this? How am I supposed to unbelieve it? Judge Watford also said if the government were to ask affirmatively, do you fear return, that that would seem to satisfy — that that would have satisfied his concerns. Is that all that needs to happen? No, Your Honor. And I don't think that Judge Watford went that far. I think he said at a minimum they need to ask that question because there's no rational reason for not asking that question. What else? Well, he didn't say. He said that — Well, I'm asking you. What else? You said — I think that the rest, yeah. I think that the rest, right. You said you'd be satisfied that if it went back and the district court issued another — issued an injunction addressing procedures, that that would satisfy your concerns as well. So I want to know, what would the district court have to do to satisfy your concerns? Yeah. Thank you, Your Honor. I think that there's two things. One is — and actually, the simplest thing is just to adopt the procedure that it stopped in other — is adopted in other streamlined proceedings, the reasonable fear procedure. And there's two important things there, because they have to adopt something like — something either that or something like it. And the two important things are to have a screening standard, not the ultimate standard, more likely than not. Right now, they're applying the ultimate, more likely than not standard for a proceeding which is, you know, a short proceeding, not something where you have a full adversarial hearing. They're expecting someone to meet that standard in this kind of truncated proceeding that has no safeguards at all. So the first thing is the standard. There needs to be a screening standard, not the ultimate standard. The second thing is there need to be the same kinds of just basic procedures that we see the government implemented in the other contexts in which it's — was trying to meet the nonreformal obligation, and that's expedited removal, reinstatement of removal, and administrative removal. First, there's some kind of notice, notice that individuals — like as Judge Wadford said, first, you know, you've already said, okay, putting that aside, let people know that they have to request a fear, ask them about a fear. In addition, give them an opportunity to consult with counsel. I mean, we have a situation — again, this is — to me, it seems that it raises the same level of irrationality as not asking people, do you have a fear? There are people who have counsel, but they're not allowed to consult with those counsel in this — in this fear interview. These are people who don't know what — how to make out a claim to go back to Mexico, but they're not allowed to consult with counsel. So there's consulting with counsel. There is — there is — consulting with anyone, actually, but consulting with counsel. There is the right to an interpreter. This provision doesn't even guarantee a right to an interpreter if you don't speak the language. There's the right to a written decision that sets forth the reasons that the adjudicator is deciding you don't have a fear. And then there's — there's review by an independent adjudicator, an immigration judge. You know, all those things sound like — like really good ideas. What's your statutory or treaty authority for that level of detail? Well, I think that the best authority is that this is what the agency put into place when it was required to meet its nonreformal obligation in these other contexts. So in order to provide for withholding of removal in reinstatement, administrative removal, it provided these procedures. And in its lesson plan, it said these were necessary to comply to bring the — to bring these proceedings, which notably, it's important to say, neither reinstatement of removal nor administrative removal say a word about withholding of removal, the kind of protection you would get under nonreformal. But the agency implemented them to give people an opportunity to apply for this. And this was in order to comply with their treaty obligations and with the reforming statute. When the agency did it before, did it do it by notice and comment rulemaking? Yes, it did. And is there an argument here, then, that if they're going to change the regulation or change the rule, that they should do that by notice and comment rulemaking? There is an argument, Your Honor. We don't think — I mean, yes, there is that argument. And — Because I'm a little — as you can tell, I'm a little hesitant to impose upon the agency all the detail that you just asked based upon the authority that seems now to exist in terms of both treaty and statute. The agency's done it already by regulation. They've obviously repealed the regulation or superseded the regulation. Maybe the right solution is to say that the previous regulation stands until they've put in a new one after notice and comment, and then we'll have a look. Maybe, Your Honor. But I don't think that — we're not saying that these — that these regulations stand. These regulations apply particularly to reinstatement and administrative removal. They don't apply to return. We think that they should have promulgated or could have promulgated regulations. I do think that one answer to your question would be, we're not saying that this Court has to say, here's the procedures. At a minimum, though, it has to say that the government has not met its — its, you know, its responsibilities under the APA to provide a reasoned explanation for departing from those procedures and for — and for providing procedures that, as you said, are nothing, do nothing. And you could say, and then to remand to the district court to decide on an expedited basis, you know, what those procedures would be. Now, in the meantime, though, it would have to be enjoined. It would have to be enjoined because it doesn't — it violates the APA. Kennedy. Now, if we were to hold with respect to the statutory argument that we spent most of the time with in the prior argument with your adversary, would that automatically take care of the reform or not? Yes. I mean, if you enjoin — I mean, I guess it depends, Your Honor. If you decide on statutory grounds, you're still going to have the issue of how you frame the injunction. And you can either frame your injunction to enjoin the procedure completely. This goes in terms of the preliminary injunction posture, and you have to consider the balance of equities. And so you could either enjoin the policy completely, or you could decide we're going to enjoin it for those people who are suffering the most, and so we're going to do it by requiring that they change their screening procedure. So you could do either. So, yes, you could do that without — if what you're suggesting is could you do this without reaching the non-refoulement claim, you could. And that's part of my question, yes. I think that you could. I think that in the interest of, you know, completeness, efficiency, judicial economy, it makes sense to rule on it, especially because, well, I also think it is so strong, you know, in this case — in this case, there's no — at this point, there's no judge, either on this circuit or in this case the district courts, who has considered this issue and has found that we don't succeed — you know, that we're not likely to succeed in finding that this procedure is unlawful. Obviously, on the statutory claim, there's been, you know, mixed signals on that. So we think it makes sense to be having an alternate argument just to be able to be more — just to ensure that we get some relief. So that's what our concern is there. In terms of your concern about is there a basis for you to set out what those procedures should be, again, I would say I think that — I think that there is a strong basis to say that they should be something like what's in the reasonable fear context, that they should have, you know, at a minimum, you know, asking a question, some kind of notice. Now, I understand all that. Okay. You know, there's a — those would be good ideas. Right. And what statutory or treaty authority would give us the ability to say those must be the procedures? Well, I think what you could say is there's the withholding statute. It doesn't say specifically that, but it sets forth the procedures that would be required in a full-blown withholding hearing. And Judge Seaborg said, you know, that doesn't really apply very well. Yeah. It does not apply squarely. I think that it's true that it doesn't apply squarely in the sense that we're not saying that in the context of returns, if it applied squarely with all of its procedures, that then you'd have to say you can't return somebody. You have to wait until they have a full-blown hearing and are ordered removed. But it does apply in the sense that it says you have to have a meaningful procedure. And what the withholding procedure and the withholding statute say is that in order to decide somebody's ultimate claim to withholding on the more likely-than-not standard, that requires an immigration judge. So if they want to implement this in the return context, which, as we were saying, is more comparable to what they do in the reinstatement and the administrative removal or expedited removal, what they need to do is, at a minimum, not use that ultimate standard more likely-than-not, but adopt a screening standard. And the screening standard that seems to be the most fitting, because it's exactly the same to what they implemented in reinstatement and administrative removal in order to allow people to apply for withholding, is the reasonable fear standard. So that's where that comes from, a combination of the statute, which has said if you're going to use the ultimate standard, you need to have these kinds of procedures. And if you're not going to use the ultimate standard, then you've got to still make sure it's something meaningful. I think that you also — there's also strong support in the UNHCR amicus brief about why the kinds of basic safeguards that we're talking about are required under international law as well. And it basically says that a procedure that doesn't have counsel and access to, you know, review by an independent adjudicator notice, that that would not meet the international standards. And finally, as we note in our own — in our briefing, there's just basically due process jurisprudence. I mean, mandatory — withholding of removal and the nonreform — the prohibition against nonreform are mandatory. And this gives rise to a certain level of due process protection, that somebody shouldn't be able to be deprived of a mandatory entitlement without basic procedures that comply. And we have a — in our brief, we cite to just basic due process authority for why that includes notice, opportunity to — an opportunity to respond. I mean, right now, I just wanted to say again, and I think that this is already clear, but what this procedure involves is — is so minimal. I mean, it's basically — it is just an interview before an asylum officer that happens — you know, can happen within a few hours of when you come. You have no time to prepare. You have no notice that you even should be talking about your fear of return to Mexico. You know, if you have an attorney, you can't consult with that attorney. Well, we got all that. So it's — it's just so minimal that, at a bottom line, it seems that — I mean, at a bottom line, for the reasons both Judge Seaborg and Judge Wadford said, this does not meet the standards of the APA. So — Switch to the statute. Your time is beginning to run out. Oh, you want me to just address — Well, you want to — Well, let me just say — let me just — yeah, let me just say, I mean, I think that we then amplified it with our — with our briefing, you know, to this Court. I think that the government's position — and you called them on this, you know, Judge Fletcher — the position that just because they put someone in regular and rural proceedings, that means they're under B-2, there's no authority for that, except that that's what they're saying. And, in fact, it's contradicted by the fact that people who are under B-1, who are under B-1, who pass a credible fear, are put into regular removal proceedings. They're not under B-2. What do you do with the argument, though, that B-1 does not mention Section 240 or 1229a? It's true it doesn't mention it, but I don't think that there's anything that says in order to put somebody in regular removal proceedings, there needs to be a statute that specifically says you can do it. People are put into regular removal proceedings all the time, and it's not under 1225b-2, you know. Give me an example of someone putting into regular removal procedures under Section 240 that's not a B-1 and not a B-2, or is there such a person? You know, I don't have the authority in front of me. My assumption would be that everybody who is — and I can get back to you on this, Your Honor — but my assumption would be that those people who are not arriving aliens and aren't seeking admission are put into, you know, regular removal proceedings all the time. They're not under B-1 or B-2. B-1 and B-2 have to do with people who are arriving at the border who are, you know, seeking admission. That's not what we're talking about with respect to other people who have been here. That is so. For example, someone's coming into the country, that person is in the country, and — Then they're being deported, and they're put in a regular removal proceeding. He gets an NTA. Right. And then he's put in a regular removal proceeding. Right. And there's — and there's no specific statutory provision that says you're going into a regular removal proceeding? My understanding, there isn't. But I really should check that, Your Honor. But it's my understanding that there isn't. But that's your argument pending confirmation. Right. Right. If we want additional briefing, we'll ask for it. Okay. So if that's the request, don't worry. Okay. I just — I realize I only have two minutes left, but I just want to point out that, as I said, I think that this argument, the nonreform argument on the merits, I think, is very strong. It's also very strong in terms of the balance of equities, because the government doesn't really have any basis for saying it has an interest in not providing an adequate nonreformal procedure. It itself has said it has an obligation to do that. It has obligation to come up with a procedure that's not going to result in the return of people to persecution and torture. So I think that the interests at this point, you have the strong interest of not — of being returned, which coincides with the government's interest. They should have that strong interest as well. And you also don't have their concern about that they can say we're being enjoined from applying MPP. We're saying, okay, apply MPP, but you've got to apply it with a procedure that at least provides these kinds of protections against torture and nonreformal, which you yourself have said you were going to do, but, you know, utterly failed to do. So I think that in that case, the equities in this — you know, the balance of equities and the concerns that the motions panel had about that are, you know, are less acute. Just to address briefly the question about the scope of the injunction, which, I mean, the government didn't have a chance to address, but we think that for the same reasons as in East Bay, there's no basis for limiting this injunction geographically. I mean, our plaintiffs are not just limited to the Ninth Circuit. Our plaintiffs, even if they were, have clients that were — you know, that are — do work outside of the Ninth Circuit. Well, anyway, I should step back. The government never suggested a geographical limitation. It suggested the same limitation they suggested in East Bay, which is that it should be limited to individuals and their clients. And for the same reason that that doesn't work here, it doesn't provide the relief that the organizational plaintiffs need. But the same thing is the case, I think, that Judge Seaberg was well within his authority to say this is the only way to frame an injunction that's going to provide the relief that the organizations, you know, need to prevent their suffering. Okay. Thank you. Now, the government has sought to reserve time. We took you up to the end. Let's put four minutes on the clock. Thank you, Your Honor. I'll be quick and get right to it. As a starting matter, Your Honor, on the scope of, you know, injunctive relief, if the Court were to reach that question, the motions panel did recognize that the only two claims that could support a nationwide injunction were the statutory authority claim and the notice and comment claim. If the Court were to have concerns on the non-refoulement piece, you know, whether it be the government needs to ask a question or so forth, the appropriate remedy there, consistent with the motions panel decision, would not be to uphold the injunction. It would be simply vacate the injunction, and remand would just the directions to the agency to be able to continue using MPP, but just, you know, you have to affirmatively ask a question about fear, if that were the panel's concern. Addressing... I'm not sure I fully got that. Say again, as to the non-refoulement? Sure, Your Honor. If the panel's concern were that the procedure were inadequate to meet non-refoulement obligations... I think it's refoulement. It's not foul. It's fool. Very good, Your Honor. It's like scienture. I've heard many different pronunciations. As to the so anyway, I think it would be as simple as that. I mean, the motions panel did recognize that, you know, if the MPP is statutorily authorized and if it satisfies notice and comment procedures, it would be a question of, you know, there wouldn't be a nationwide injunction available. There would be just, you know, say the agency needs to ask the question, you know, or whatever, whatever... Excuse me. I'm still not sure I follow. You're saying that if we were to conclude that at a minimum, the government needs to ask the question, do you have a fear? You're saying that we don't have to have, that we should not have a nationwide injunction on that point? Correct, Your Honor. I mean, just remand without vacate or direct, that's the normal approach to agency proceedings, and just say, you know, agency, ask the question. Especially in this context, Your Honor, where agency asks the question, but if we're directing the agency to do it, you're saying the agency doesn't have to do it in every instance? I mean, what are you saying when you're saying it doesn't have to be nationwide? Your Honor, I'm not going after the nationwide point. I'm just saying that if that's the legal flaw that the panel finds, the appropriate response is just remand with directions to address that flaw, not halt the policy initiative. Well, it seems like you'd keep the injunction in place pending the agency taking some affirmative action to address the court's concerns. That's not appropriate in this context, Your Honor. Why not? Because this is a context in which the agency has statutory authority. This is an area where the government is entitled to use the procedures that it deems appropriate. That's Trinidad v. Garcia. If there are procedures that are calculated to address more likely than not that procedures are left up to the executive branch and to each contracting state. So in the meantime, the government does not have to ask the question? I'm saying that the government, you would just be telling the government, ask the question. No injunction, just ask the question and you can proceed. That doesn't make any sense. I don't know a district court judge that would be anxious to do that. I mean, you would keep the injunction in place pending adoption of some policy. I mean, they issued policy statements here, correct? The Secretary issued a whole set of criteria. And so it seemed to me that if that's we were going to do something, if that were one possible result, you would tell the district court, injunction remains in place pending the agency's adoption of a policy that addresses this violation. That just improperly requires the executive branch to go begging to an Article III judge to let it exercise its prerogative functions. No, it doesn't. What do you mean begging? It doesn't. That is not a ---- I mean, it just the district court is just ensuring that the agency complies with its statute, with its treaty and legal obligations. And it can address that by just saying, agency, if the concern is a question, just asking a question, just say, look, you need to ask this sort of a question. But if the district judge says, ask the question, that sounds like an injunction. I mean, if the district judge is directing the government to do something, that's the very definition of an injunction, right? Again, I think in the remand without vacate or normal APA context, if that's all, the court is not required to issue an injunction. It can issue instructions to the agency, and then things can go from there appropriately. And I think that's ---- So an instruction to the agency that says, do this, doesn't say, use your discretion, but says, do this, you're saying that's not an injunction against the agency? Your Honor, I don't get that. Your Honor, I think that you would appreciate that if the district court squarely issues an injunction, then the government has to go back and have the district court undertake further proceedings, potentially, you know, however long the district court may take with those proceedings, to allow the government then to issue the policy. That's a big harm here, where this policy's been in place for many months. But, okay, it may be that we're not going to make any progress on this point, but I just got a basic definitional problem. If the district judge is telling the agency, as a mandatory matter, do X, that sounds to me like the district judge isn't joining the agency. But you're saying that's not an injunction? I think no. I think we're just asking. We would say that the appropriate approach there would just be remand with instructions to address to, like, an allowance to continue the policy, including by addressing certain things. I understand that you don't agree with that. No, I think you just reversed field, because you said remand with instructions to reconsider. You didn't say remand with instructions, not remand with instructions to ask the question. Your Honor, I don't want to put words in the panel's mouth as to what you would think the problem is. I have been positing that if it is the affirmative, the absence of an affirmative question, it could be addressing that. And that would be for the agency to address while continuing to undertake its policy. Thank you, Your Honor. I thank both sides for their helpful arguments. Innovation Law Lab submitted for decision. We're now in adjournment.
judges: Fernandez, W. Fletcher, Paez